UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
  LUIGI BONAFFINI,                   :
                                             :
                 Plaintiff,      :
                                               :     **MEMORANDUM DECISION AND**
       -against-            :     **ORDER**
                                             :
  THE CITY UNIVERSITY OF NEW YORK,  :     20-cv-5118 (BMC)
  and ANNE LOPES, as Provost,       :
                                           :
                Defendants.    :
--------------------------------------------------------- X

**COGAN**, District Judge.

      This is an action for national origin discrimination under Title VII, and national origin and age discrimination under New York law, brought by a professor of Italian, formerly teaching in the Italian Program at Brooklyn College.[1]  It stems from the decision of the College in 2019 to put its Italian Program on hiatus due to the cancellation of seven Italian courses for lack of student interest and a ten-year history of low enrollment, and the adjustment of plaintiff's teaching schedule as a result of the cancellation of those classes.  Plaintiff contends that the cancellation was based on his and the other two professors' national origin and age because other departments were in just as bad shape, and it didn't happen to them.

      Since plaintiff was allowed to continue teaching under essentially the same conditions as he had prior to the hiatus of the Italian Program and has offered no adequate comparison of other

---

[1] Plaintiff's first complaint also asserted age discrimination claims under federal and state law.  However, I dismissed the federal claims under the Age Discrimination and Employment Act, 29 U.S.C. § 621 *et seq.*, on the grounds of sovereign immunity and lack of individual liability under that statute.  See Bonaffini v. City University of New York, No. 20-cv-5118, 2021 WL 2206736 (E.D.N.Y. June 1, 2021).  The action still has age discrimination claims under State and City law, but because, as shown below, I am declining to exercise supplemental jurisdiction over plaintiff's state and city law age discrimination claims, their substance is not addressed in this decision.

departments to show that the Italian program or its professors were singled out for special treatment based on their national origin, defendants' motion for summary judgment is granted.

## BACKGROUND

### I.    Ascertaining the Record

It is fundamental that Fed. R. Civ. P. 56 allows consideration only of "admissible" evidence. When plaintiff first put in his opposition to defendants' motion, the Court convened a status conference and explained that plaintiff's opposing affidavits were replete with hearsay, opinion, argument, "upon information and belief" statements for important information with no source cited, and matters beyond the affiants' personal knowledge. The Court could have simply stricken them then, but instead, the Court gave plaintiff's counsel an opportunity to refile his opposition in proper evidentiary form, explaining to him what that means. He refiled it, but it is no better – counsel simply does not understand the difference between an affidavit and a brief.

To make matters worse, defendants did not attempt to prevent plaintiff and his witnesses from giving rambling speeches at their depositions, often non-responsive to the questions, that also consisted of argument, opinion, and lack of personal knowledge. Plaintiff has relied heavily on those deposition excerpts in opposing defendants' motion. Much of that material is inadmissible as well. It has made plaintiff's submissions all but incomprehensible.

And because plaintiff's response to defendants' Rule 56.1 statement consistently relies on all of this inadmissible evidence, plaintiff has failed to adequately respond to defendants' Rule 56.1 statement.

The Court has tried to pull a few facts on key issues out of plaintiff's exhibits and affidavits, but it is not going to parse each line trying to distinguish between what is admissible and what is not. See Kane v. De Blasio, 19 F.4th 152, 167 n. 15 (2d Cir. 2021) ("[J]udges are

2

not like pigs, hunting for truffles buried in the record.") (quoting United States v. Morton, 993

F.3d 198, 204 n.10 (3d Cir. 2021)).  The upshot of this is that I am accepting defendants' Rule

56.1 statement as true to the extent it is supported by admissible evidence.

## II.    Facts Relating to National Origin Discrimination

Plaintiff Luigi Bonaffini was born in Italy.  He was a tenured professor in the Department

of Modern Languages and Literatures (the "MLL Department") at Brooklyn College from 1976

until his retirement in March 2020.  The MLL Department is one of twelve academic

departments within the School of Humanities and Social Sciences at Brooklyn College.

Defendant Anne Lopes has been the Provost and Senior Vice President of Academic

Affairs at Brooklyn College since 2018.  She is also Italian-American.  Her father was born and

raised in Italy, as were all four of her grandparents.

From 1998 through Fall 2019, there were three tenured full-time faculty in the MLL

Department who taught classes within the Italian major and minor, referred to as the "Italian

Program."  These faculty were plaintiff, Professor Claire Huffman, and Professor Fabio Girelli-

Carasi (the "Italian Faculty").  In January 2019, in addition to the Italian Faculty, MLL had four

full-time faculty teaching Spanish, two teaching French, and two teaching Chinese.  There were

also adjunct faculty hired to teach elementary-level language courses.

Enrollment in the Italian Program was consistently low for about a decade.[2]  Without

considering adjunct faculty in the MLL Department, enrollment in the Italian Program was lower

---

[2] Plaintiff attempts to rebut this undisputed evidence by showing that Beginner Italian Language course (Italian 1010) was fully enrolled in November 2019. That one class does not call into question defendants' evidence showing the consistently low enrollment in the Italian Program, *i.e.*, enrollment in upper-level Italian classes and very few students pursuing Italian majors or minors.  Plaintiff himself acknowledged the low enrollment in the Italian Program at his deposition.

than in the majors and minors taught by the other full-time faculty in French, Spanish, and

English.  Here are the enrollment numbers for the various MLL Departments from 2010-2019:

Majors from Fall 2009 -  2019

|  | French | Italian | Spanish |
|---|---|---|---|
| **Fall 2009** | 24 | 8 | 42 |
| **Fall 2010** | 21 | 4 | 41 |
| **Fall 2011** | 15 | 6 | 35 |
| **Fall 2012** | 20 | 2 | 35 |
| **Fall 2013** | 17 | 2 | 29 |
| **Fall 2014** | 11 | 5 | 26 |
| **Fall 2015** | 14 | 5 | 21 |
| **Fall 2016** | 10 | 3 | 13 |
| **Fall 2017** | 8 | 3 | 20 |
| **Fall 2018** | 6 | 1 | 29 |
| **Fall 2019** | 13 | 3 | 33 |

Undergraduate Minors from Fall 2009 -  2019

|  | French | Italian | Spanish | Chinese |
|---|---|---|---|---|
| **Fall 2009** |  |  |  |  |
| **Fall 2010** | 8 | 3 | 16 | 31 |
| **Fall 2011** | 12 | 4 | 17 | 29 |
| **Fall 2012** | 7 | 4 | 14 | 24 |
| **Fall 2013** | 11 | 6 | 14 | 18 |
| **Fall 2014** | 9 | 4 | 17 | 11 |
| **Fall 2015** | 8 | 4 | 18 | 13 |
| **Fall 2016** | 8 | 2 | 17 | 10 |
| **Fall 2017** | 6 | 6 | 14 | 7 |
| **Fall 2018** | 10 | 1 | 13 | 6 |
| **Fall 2019** | 10 | 0 | 27 | 13 |

Because of the low enrollment in the Italian Program, Italian courses often failed to meet

the minimum enrollment threshold and had to be canceled or converted to tutorials – independent

study courses – instead of regular courses.  There are minimum teaching requirements imposed

by the City University of New York and faculty receive less credit for teaching tutorials.

In January 2019, Vanessa Perez Rosario became Chairperson of the MLL Department. She attempted to increase enrollment in the Italian Program but, in her view, faculty wasn't willing to work with her to do this; in any event, it is undisputed that the effort was not successful.  She cautioned the Italian Faculty that the viability of the Italian Program was in doubt.  She advised Kenneth Gould, the Dean of the School of Humanities and Social Sciences, (which houses the MLL Department) that the MLL Department could no longer offer an Italian major due to low enrollment in upper-level Italian classes.

Provost Lopes and Chairperson Perez Rosario decided to put the Italian program on temporary hiatus starting in Spring 2020.  Lopes, Gould, and Perez Rosario met with the Italian Faculty on September 24, 2019 and so advised its members. When the Italian Faculty protested this decision as discriminatory, Lopes said, "[t]he Italians all moved out of Brooklyn, so you don't have a basis for a major anymore."  That made the Italian Program one of 13 Brooklyn College programs on hiatus for the Spring 2020 semester.  Lopes told the Italian Faculty members that the MLL Department would continue to offer Italian culture, literature, and language classes, and offered to authorize time for the Italian Faculty to work on programming to revive the Program.

Because of the suspension of the Italian Program and the cancellation of seven Italian classes in the Fall Semester 2019, the MLL offered fewer Italian classes in the Spring of 2020. The cutbacks did not leave enough teaching hours for all of the members of the Italian Faculty to meet the minimum requirements imposed by CUNY.  As to plaintiff, to make up for the lost hours, Perez Rosario asked him to teach one Italian course and two Western Civilization courses offered by the English department, one titled "Emergence of the Modern" and the other "Ideas of Character in Western Literary Tradition."  Plaintiff had taught both courses previously during a

regime when students had to take a core curriculum, which, by this time, had been replaced by a general education curriculum. One class would have been taught at 9:00 a.m. and the other at 3:00 p.m.

Plaintiff was dissatisfied both with the courses and the schedule to which he was assigned. He retired from the College in March 2020.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). Indeed, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.

The Second Circuit has instructed district courts to be wary of granting summary judgment in employment discrimination cases where the employer's intent is at issue.  See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  The rationale for approaching such a case cautiously is that "writings directly supporting a claim of intentional discrimination are rarely, if ever, found," and circumstantial evidence should therefore be given special attention in an employment discrimination case.  Id.  The Second Circuit has, however, made clear that summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).  Accordingly, the function of the court on a motion for summary judgment in an employment discrimination case "is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'"  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994)).

## II.     National Origin Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Courts analyzing discrimination claims under Title VII apply the three-step burden-shifting framework originally established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Ruiz v. Rockland County, 609 F.3d 486, 491 (2d Cir. 2010); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In the first step, a Title VII plaintiff must establish a *prima facie* case of discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  The establishment of a

*prima facie* case creates an inference of discrimination. In the second step, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action. Id. at 253 (citing McDonnell Douglas, 411 U.S. at 802-03). If the defendant satisfies this burden, then under the third step, the burden shifts back to the plaintiff to raise a factual issue that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," Burdine, 450 U.S. at 253, or that his *prima facie* case, even when considered against the defendant's evidence, is sufficiently compelling that a jury could reasonably find that he was terminated on the basis of his class membership. In determining whether the plaintiff has met this burden, the court must take a "case-by-case" approach that weighs "'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case.'" James v. N.Y. Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148-49 (2000)) (cleaned up). "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited . . . discrimination occurred.'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quoting James, 233 F.3d at 156). In considering whether a plaintiff had made his *prima facie* showing, the court should consider only the plaintiff's proffered evidence, not defendant's evidence in response to it. See Graham, 230 F.3d at 41-42.[3]

---

[3] Defendants' motion was particularly unhelpful in undertaking this analysis. Although paying lip service to the McDonnell Douglas test, they merged the fourth factor in demonstrating a *prima facie* case – circumstances sufficient to show an inference of discrimination – with the third McDonnell Douglas step – showing pretext for the offered neutral reason or other evidence of discrimination. Thus, defendants' brief point heading began with "Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination," but the subheadings under that included "Defendants Have A Neutral, Non-Discriminatory Reason for Their Actions" and "Plaintiff Cannot Demonstrate Pretext," both of which are separate from plaintiff's demonstrating a *prima facie* case. The fourth factor in the *prima facie* case inquiry and the third step in the McDonnell Douglas framework overlap to an extent, but because the former requires consideration of only plaintiff's evidence, they are not the same. See Porter v. Donahoe, 962 F. Supp. 491, 501 (E.D.N.Y. 2013).

A. *Prima Facie* Case

The following well-established four-factor test is used to determine whether there is a *prima facie* case of discrimination: (1) plaintiff must belong to a protected class; (2) plaintiff must have been qualified for the job; (3) plaintiff must suffer an adverse employment action; and (4) the circumstances surrounding the adverse employment action must give rise to an inference of discrimination. See, e.g., Graham, 230 F.3d at 38. Plaintiff's burden of making this showing is *de minimis*. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

There is no dispute that plaintiff belongs to a protected class and was qualified for his job. As to adverse employment action, plaintiff claims two: (1) he is being made to teach within the English Department instead of the Italian Program, which means his expertise is not being utilized; and (2) scheduling his classes at 9:00 a.m. and 3:00 p.m. is burdensome.

First, defendants dispute that these changes are adverse employment actions. They argue that the two courses to which plaintiff has been assigned are courses that he taught previously and are Western Civilization courses that have included segments on Dante, and that plaintiff has autonomy as to how much of an Italian focus he wants to impart to each course. They have submitted syllabi from other instructors showing the broad range of topics those courses entail. As to plaintiff's scheduling protest, defendants regard it as too trivial to constitute an adverse employment action.

Subsequent to the submission of defendants' motion, the Supreme Court decided Muldrow v. City of St. Louis, 601 U.S. 346 (2024), which may have broadened the definition of "adverse employment action."[4] The Court rejected qualifiers like "significant" or "material,"

---

[4] Neither party has called this decision to the Court's attention or requested leave to file a supplemental brief.

9

terms that had been part of the test used in the Second Circuit and other Circuits, see id. at 353 n.1, in favor of asking whether the employee suffered "some injury," "some harm," "some disadvantage[]," or whether he was "worse off."  Id. at 354, 355, 356, 359.  Justice Thomas, concurring in the judgment, referred to the new standard as "more than trifling," but he thought that "the Courts of Appeals all appear to articulate the same principle."  Id. at 360.  Justice Alito, also concurring in the judgment, agreed, fearing that the Court's attempt to come up with new words would be "unhelpful" to lower courts because "injury" or "harm" "necessarily incorporate[s] at least some degree of significance or substantiality."  Id. at 362-63.  He saw "little if any substantive difference between the terminology the Court approves and the terminology it doesn't like."  Id.

It seems clear enough that the Supreme Court majority was attempting to broaden the scope of adverse employment actions, as it cited several lower court cases using the "material" or "significant" terminology that the Court thought had construed "adverse employment action" too narrowly.  Id. at 355-56.  Nevertheless, not every change in working conditions, by itself, can be an adverse employment action.  If it could, then we might as well drop the adverse employment action factor from the *prima facie* test, because every plaintiff who brings a discrimination case believes that he is worse off as a result of something that happened to him at work.  At least, there must be an objective component and the perceived harm or injury must be, as Justice Thomas stated, "more than trifling," even if it doesn't rise to the level of "significant" or "material."

Applying that standard, I am skeptical that plaintiff has shown proof of an adverse employment action even under Muldrow.  With regard to his new course assignments, he was assigned to courses that he has taught before, and he has been given license to structure them to

take into account his Italian literature and cultural expertise.  (He denies this, but he produced no evidence that he lacked such autonomy, and the College states that he has it.)  It's not as if he was reassigned to the Mathematics or Engineering Department.  Instead, he was reassigned to Western Civilization courses in which Italian culture and literature are indisputably crucial parts. All that is left for him to complain about with these courses is that he would have to teach them in English instead of Italian with somewhat less focus on his expertise than he would like, but as he acknowledged in his deposition, and as the number of Italian majors and minors cited above shows, there was simply not enough student interest in those kind of advanced Italian courses to support his preference.

I am even more skeptical about plaintiff's claim that the five-hour gap in his proposed teaching schedule constituted an adverse employment action.  For people used to working eight or more hours a day (which is most people), the complaint of having to teach a 10 a.m. course and a 3 p.m. course evokes Albinoni's Adagio in G minor played on the World's Smallest Stradivarius.  He has not even told the Court what schedule he had before the proposed change or what his preferred schedule would be.  The five-hour gap would give him the time to write, research, hold office hours, perform administrative matters, and undertake personal tasks.  If what he wanted was a 10 a.m. class and an 11 a.m. class so he could have the rest of the day free, the five-hour gap seems trivial, at least without some showing about how it disadvantaged him.

Although the facts in Muldrow should not be seen as a floor for an adverse employment action, they are far from the facts here.  There, the plaintiff, a plainclothes Sergeant in the St. Louis Police Department's specialized Intelligence Division, investigated public corruption and human trafficking.  She also oversaw the Gang Unit and served as the head of the Gun Crimes Unit. Those positions, in turn, resulted in her being deputized as a Task Force Officer with the

Federal Bureau of Investigation, which provided her with FBI credentials, an unmarked take-home vehicle, and authority to pursue investigations outside St. Louis.  She worked a traditional 9 a.m. to 5:00 p.m., Monday through Friday week.

The alleged adverse employment action was her transfer out of the Intelligence Division to a routine uniformed (non-plainclothes) job in another district.  Her rank and pay remained the same, but instead of working with high-ranking officials on departmental priorities in the Intelligence Division, she supervised day-to-day activities of neighborhood patrol personnel, approving arrests, reviewing reports, and handling administrative matters, as well as doing patrol work herself.  Her schedule was no longer 9 to 5 and no longer just weekdays; she had a rotating schedule that included weekend shifts.  She no longer had the use of a car or FBI credentials.

What the Supreme Court reversed was the Eighth Circuit's determination that the plaintiff's transfer was not "a materially significant disadvantage." Muldrow v. City of St. Louis, 30 F.4th 680, 688 (8th Cir. 2022).  The Eighth Circuit noted that she had maintained her rank, salary, and benefits and still acted as a supervisor, investigating serious crimes.  It did not mention her more burdensome schedule, the loss of her car, or her loss of prestige as a member of a joint state-federal task force with federal-equivalent authority to investigate and effect arrests.

Muldrow's facts make it clear why the Supreme Court felt the words "material" or "significant" needed a course-correction.  I don't think the Second Circuit or district courts within it would have come out as the Eighth Circuit did, even though they would use the term "material" or "significant."  The lower court cases critically cited by the Supreme Court confirm that some lower courts had gone astray – they all reflected decisions that had too narrowly construed the scope of "adverse employment action."  See Cole v. Wake Cty. Bd. of Educ., 834

12

F. App'x 820, 821 (4th Cir. 2021) (per curiam) (school principal forced into a non-school-based administrative role supervising fewer employees deemed not "significant"); Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 635 (10th Cir. 2012) (shipping worker changed from normal hours to only nighttime hours not a "significant" change); Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999) (engineering technician forced to work at a new job site consisting of a 14-by-22-foot wind tunnel didn't have a "significant detrimental effect."). All of these cases had an objective component that would cause a reasonable person to consider them meaningful detrimental changes ("meaningful" might actually be a better word than "material" or "significant"), and that is why the Supreme Court chafed against the misuse of the term "significant."

In contrast, although the Supreme Court cited a Second Circuit case to note that it was one of the Circuits to apply a "materially significant disadvantage" test, it did not criticize that case on its facts. See Muldrow, 601 U.S. at 353 n.1 (citing Williams v. R. H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)). Nor could it: Williams involved an employee who wanted to be transferred and demoted to a lower-paying job because the lesser job was in her preferred place to live. The Second Circuit held that the denial of her request was a "subjective, personal disappointment" that did not "meet the objective indicia of an adverse employment action." Williams, 368 F.3d at 128. Sounds right, even under Muldrow.

I need not determine whether the Muldrow majority's decision to completely jettison words like "material" and "significant" will yield a more salutary result than the concurring Justices' views that all they needed to do was to instruct lower courts to apply those terms less restrictively. For our purposes, what matters is that plaintiff's perception of adversity is wholly

13

subjective, ranging from the non-injurious or harmful to the trivial.  Teaching English courses and having a five-hour schedule gap are not adverse employment actions within Muldrow.

Notwithstanding my skepticism as to whether plaintiff has shown an adverse employment action, the Second Circuit has not yet had the opportunity to apply Muldrow, so I do not have the benefit of its instruction.  But at the very least, Muldrow suggests that courts should apply the "adverse employment action" factor using the same standard used for the fourth *prima facie* factor – plaintiff's showing of adversity need only be *de minimis*.  See Dixon v. Blinken, No. 22-cv-2357, 2024 WL 4144105, at *3 (D.D.C. Sept. 11, 2024) ("As the Supreme Court [explained in Muldrow], nothing in Title VII . . . distinguishes between significant disadvantages and not-so-significant ones.") (cleaned up).

Looking at it that way, I suppose plaintiff has shown a change in his job responsibilities, at least with respect to his newly-assigned courses, that could rise to the level addressed in Muldrow.  Muldrow instructs courts to be careful not to put too much weight on what constitutes an adverse employment action because there are other protections against meritless claims – principally, requiring proof of discriminatory intent.  Title VII "requires that the employer have acted for discriminatory reasons ... And in addressing that issue, a court may consider whether a less harmful act is, in a given context, less suggestive of intentional discrimination.  So courts retain multiple ways to dispose of meritless Title VII claims … ."  Muldrow, 601 U.S. at 358. With that guidance, I will put aside my skepticism about whether plaintiff has demonstrated an adverse employment action and proceed to the other factor that defendants challenge, namely, whether the circumstances surrounding the alleged adverse employment action support an inference of discrimination.

As to that, plaintiff has very, very little to show discrimination on the basis of his national origin.  Primarily, he cites the statement from Lopes that "[t]he Italians all moved out of Brooklyn, so you don't have a basis for a major anymore."  A reasonable jury could not see that as a derogatory statement against Italians or Italian-Americans.  It is certainly hyperbolic, as clearly not "all" the Italians have moved out of Brooklyn.  But regardless of its accuracy, it is the kind of demographic observation that social scientists frequently make, and it was offered in the context of trying to explain why the Italian Program was doing so poorly at attracting Italian majors and minors.  In this light, the observation was an alternative to the explanation that Perez Rosario had offered for the departmental failure – that the Italian Faculty simply would not undertake the grassroots effort to increase enrollment.

Second, plaintiff asserts that in other MLL departments, professors were not forced to teach language courses primarily focused on different languages than the ones in which they specialized.  That seems undisputed.  Of course, as the major and minor enrollment numbers show above, it is highly questionable whether any of the professors in other departments were comparable to the Italian professors, even under a liberal standard of comparability. In 2019, French had a total of 23 majors and minors; Spanish had 60 majors and minors; and Chinese had 13 minors (plus a number of "concentrations" not counted here).  Italian had 3.  It is no wonder that the other departments' professors were able to teach in their own languages and the Italian Faculty were not.

Finally, plaintiff points to a "historical, continuing practice of systemically subjecting … Italian faculty to discrimination."  He first points to the establishment of the John D. Calandra Italian American Institute that was reorganized as a division of CUNY in 1984 "to monitor discriminatory conduct and/or under-representation of Italian Americans that was occurring

15

within the CUNY system." He brings that forward to 1992, when the court in <u>Scelsa v. City University of New York</u>, 806 F. Supp. 1126 (S.D.N.Y. 1992), issued a preliminary injunction prohibiting CUNY from moving the Calandra Institute from Manhattan to Staten Island and requiring its director to remain in his position pending trial (although the court found a lack of evidence of intentional discrimination).

From there, plaintiff goes to 2008, when CUNY awarded a financial teaching bonus in exchange for a two-year professorship. Pursuant to what one of plaintiff's colleagues describes as a "gentleperson's agreement," that bonus was supposed to alternate between professors in the Italian and Spanish Programs. The last person to receive it was a Spanish professor in 2009, after which it was suspended for lack of funds. When the bonus was restarted several years later, it again went to a Spanish professor, thus allegedly violating the "gentleperson's agreement." This, plaintiff contends, shows animus against Italians.[5]

Finally, plaintiff asserts, his two colleagues in the Italian Program have brought their own lawsuits alleging national origin discrimination against defendants.

Taken together, plaintiff alleges that these things are sufficient to give rise to an inference that the Italian Program was suspended due to defendants' hostility towards Italians.

It's pretty thin gruel upon which to build a *prima facie* discrimination case. Again, however, given the *de minimis* standard, I will assume *arguendo* that plaintiff has met it.

## B. Defendants' Justification

Little needs to be said about step two of <u>McDonnell Douglas</u>. It seems self-evident that defendants have articulated a colorable non-discriminatory basis for suspending the Italian

---

[5] According to plaintiff's colleague, plaintiff received this bonus sometime before 2008.

Program and having plaintiff teach within the English Department, for this showing is also measured by a *de minimis* standard.  See Droutman v. N.Y. Blood Ctr., No. 03-cv-5384, 2005 WL 1796120, at *7 (E.D.N.Y. July 27, 2005) ("An employer's burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous.").  The numbers speak for themselves.  There weren't enough students to occupy all three members of the Italian Faculty. Even plaintiff acknowledged that, for advanced courses, Lopes and Perez Rosario would have had to convert them to tutorials or cancel them.

### C.  Pretext or Other Basis for Finding Discriminatory Animus

Because plaintiff's *prima facie* case is so marginal, it is not surprising that he fails to raise a factual issue at the third step of McDonnell Douglas.  He attempts to show pretext based on his disagreement with defendants as to whether the performance of the Italian Program would have improved had it continued.  He relies on the fact, as noted above, that the beginner Italian language classes were filled, but that more illustrates the problem than the opportunity – after receiving exposure to the language, very few students stuck with the Italian Program.  Plaintiff offers his opinion that the reason upper-level courses were canceled for low enrollment was because Perez Rosario scheduled "an excessive number of upper-level courses."  That is an administrative disagreement that amounts to a "damned if you do, damned if you don't" criticism, especially since he concedes that classes had to be canceled frequently as underenrolled.  He speculates that since a college-wide language requirement was returning in 2020, enrollment in the Italian Program would have increased "drastically."  Maybe it would have, maybe it wouldn't have, but with ten years of the Program's poor performance, it was not his call to make.  He further opines that contrary to defendants' view that classes needed a critical mass of more than 15 students to succeed, the right number was four students; thus, the

need to convert courses to tutorials was a benefit, not a detriment.  Again, that is a matter of his opinion against that of defendants.  It is not for the courts to get involved in disputes over academic administration.  See generally Univ. of Penn. v. EEOC, 493 U.S. 182, 199 (1990).

Plaintiff then sets forth a list of 13 grievances that he believes show pretext.  This is where plaintiff's reliance on inadmissible evidence and distortion of the record comes to the fore.  Again, I will not go through them all because that would require pointing out every distortion in plaintiff's evidence, and some of them have already been discussed above.  But just to give one more example from early in his list, he contends that "the Italian faculty had no workload issues at the time of the decision to discontinue the Italian program."  To support that, he cites to the deposition of one of the Italian Faculty members, Professor Huffman; a snippet from an email string between Perez Rosario and plaintiff from October 2019; and a citation to plaintiff's affidavit.  He has not given me any context for any of these snippets, nor even quoted them, but a close inspection of them shows that they do not support the claim of "no workload issues" at all.

In response to a simple question, Prof. Huffman gave a long, rambling explanation about how faculty members were allowed to carry forward credit from prior years to meet their required levels for subsequent years, and for most of her decades of teaching, that enabled her to meet her requirements.  Finally, however, she was compelled to acknowledge that when the foreign language requirement at CUNY was dropped and enrollment in the Italian Program fell off precipitously from 2015-2019, she couldn't do that anymore.  Huffman predicted that with the reinstatement of the language requirement, she would recover her ability to meet her minimum credit requirement, but, again, that was only her speculation, not responsive to the question she had been asked, and not supportive of plaintiff's assertion that in the 2015-2019 period, the Italian Faculty had met its teaching requirements.

As to the email string, plaintiff has distorted it entirely by taking out of context one sentence from a lengthy exchange.  The sentence he likes is from Perez Rosario's email: "I just checked your workload and it seems you are on track regarding your teaching."  First, there is no way to tell from the context whether "on track" refers to a less-than-required commitment that plaintiff had made because it was the best that could be done given the low enrollment in the Italian Program, or "on track" may mean "not quite there yet."  More importantly, the rest of the email indicates that Perez Rosario was having difficulty filling plaintiff's teaching schedule.  After noting that plaintiff needed to teach 10 credits each semester for the next three semesters, Perez Rosario inquired:

> Are you able to teach a class in Spanish? Would you be able to teach a section of Spanish 1010 [first level Spanish language]?
>
> Additionally, you might teach one section of MLAN and section of ENGL 2007 … .
>
> Also, I can schedule one section of MLAN for you during the January term, but it will need to be an in person class.
>
> Let me know if that would work for you.  I look forward to hearing from you at your soonest.

Plaintiff responded: "As per your last email, I thought we agreed I would teach one MLAN class and the two Eng 2007 classes. … I cannot teach in person in January because of my travel plans.

And Perez Rosario replied to that with:

> I'm sorry, I'm not able to give you two ENGL classes.  The English Department is only agreeing to give each of the faculty in Italian one class.
>
> As a way to teach out the Italian major, we need to offer ITAL 2030W since this is a requirement for a major.  I would like to give you this class as well.
>
> Are you able to teach SPAN 1010 if necessary?

That's where the email string, as plaintiff has provided it to the Court, ends. In full context, it shows just the opposite of what plaintiff claims it shows. Perez Rosario was trying to fill schedules with non-Italian offerings because there was not enough interest in Italian offerings.

Finally, plaintiff cites to his own affidavit without quoting what he actually says: "Prior to the September 24, 2019 meeting, [the Italian Faculty's] workloads were always up to date and any workload issue would only be caused by the cancellation of Italian courses for us to teach." But that was the whole problem. Classes had been repeatedly canceled prior to the September 24 meeting because there were not enough students to populate them.

Despite plaintiff's extraordinary effort to confuse this case by distorting and misciting evidence, it is really quite simple: the Italian Program was failing. The MLL Department put it on hiatus, like 13 other programs at Brooklyn College, in the hopes that the Italian Faculty or defendants could find a way to restore it to sufficient enrollment levels to justify its existence. Although he claims that other programs within the MLL department were in equally bad shape but not put on hiatus, he has submitted no admissible evidence of that.

No reasonable jury could find that the placing of the Italian Program on hiatus or the assignment of two English courses to plaintiff was the result of discriminatory animus towards Italians.

**II.     Age Discrimination**

The dismissal of plaintiff's Title VII claims means that there are no longer any pending federal claims in this action. In that circumstance, when dismissal of federal claims occurs on summary judgment, the "default rule" is that state law claims should be dismissed without prejudice to refiling in state court. As the Second Circuit has stated, "we have repeatedly said that 'if a plaintiff's federal claims are dismissed before trial, the state law claims should be

dismissed as well.'" Oneida Indian Nation of N.Y. v. Madison Cnty., 665 F.3d 408, 437 (2d Cir. 2011) (quoting Brzak v. United Nations, 597 F.3d 107, 113-14 (2d Cir. 2010) (cleaned up)).

There is no reason to retain supplemental jurisdiction of plaintiff's New York State Human Rights Law and New York City Human Rights Law Claims.  Looking at the factors in Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988), there is no inconvenience to either side in going across the street and having their trial on these claims in state court.  Indeed, the interest of comity strongly suggests it.  Id. at 350.  It is a local case – a dispute between a local college that is an arm of the State of New York and one of its formerly tenured professors.  The standard of proof under the state and local law is different than the standard applied under federal law, see Henry v. NYC Health & Hospital Corp., 18 F. Supp. 3d 396, 413-14 (S.D.N.Y. 2014), and the degree to which New York wants to involve its court in reviewing academic planning and scheduling in the context of alleged discrimination is best left to those courts.  Accordingly, this Court declines to exercise supplemental jurisdiction over plaintiff's state-law claims.

## CONCLUSION

Defendants' motion to dismiss is granted to the extent of dismissing plaintiff's claims under Title VII.  His claims under the New York State Human Rights Law and the New York City Human Rights Law are dismissed without prejudice to refiling in state court.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated: Brooklyn, New York
        September 25, 2024